# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

PETE NECHOVSKI,

      Petitioner,

      v.

UNITED STATES OF AMERICA,

      Respondent.

CASE NO. 2:11-CV-862
CRIM. NO. 2:07-CR-131
Judge Watson
Magistrate Judge King

## REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings this motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. This matter is before the Court on the *Motion to Vacate*, Doc. No. 115, Respondent's *Return of Writ,* Doc. No. 130, Petitioner's *Reply*, Doc. No. 139, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Petitioner's claims be **DISMISSED**.

## FACTS and PROCEDURAL HISTORY

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of this case as follows:

> On June 7, 2007, a federal grand jury for the Southern District of Ohio returned an indictment charging Defendant Pete Nechovski ("Defendant") with conspiracy to possess with intent to distribute over 500 grams of cocaine in violation of 18 U.S.C. § 846 ("Count One"). Defendant was subsequently arrested on June 27, 2007. The indictment was superseded on October 11, 2007. In addition to Count One, Defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Two") and being a felon in possession of ammunition, also in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Three"). On January 14, 2008, Defendant filed a motion to sever Count One from Counts Two and Three for trial purposes. The district court granted Defendant's motion. A jury trial on Count One commenced on Monday, August 4, 2008. On Thursday, August 7, 2008, the jury

returned a verdict of guilty.

B. Factual Background

This case stems from a Drug Enforcement Administration ("DEA") investigation into the illegal distribution of narcotics in southeastern Ohio. During the course of the investigation, DEA Special Agent Matt Heufelder developed a confidential informant ("CI") who agreed to assist the DEA and the Columbus Police Department in the purchase of cocaine. (D.E. 99 at 43.) The CI told Agent Heufelder that he knew a man in Tennessee, identified only as "Brent," who knew a potential supplier of cocaine in Ohio. The potential supplier of cocaine was a tattoo artist from Columbus, Ohio named Arthur Shawn Jarrell. In February 2007, the CI arranged a meeting with Jarrell at a Waffle House restaurant on the east side of Columbus. Also present at the meeting was undercover Columbus Police Detective Charles Joyce.

Jarrell arrived to the meeting driving a gray GMC Suburban. At this meeting, Detective Joyce purchased two ounces of cocaine from Jarrell for $1,500.00. After the transaction was complete, Detective Joyce inquired into the possibility of purchasing kilogram quantities of cocaine. Jarrell told Detective Joyce that "his partner" had access to kilogram quantities of cocaine and that he could have the cocaine available for delivery within a couple of days if needed.

In March 2007, Jarrell contacted the CI and indicated that he had kilogram quantities of cocaine for sale. During the conversation, the CI agreed to a purchase a kilogram of cocaine for $23,500.00. On March 9, 2007, the CI met Jarrell at the same Waffle House as the initial meeting to complete the transaction. Upon arrival, Jarrell notified the CI that he did not have the cocaine in his possession because he did not want to bring the cocaine without first receiving the money. Detective Joyce and another undercover police officer subsequently arrived at the Waffle House with the money. Detective Joyce, however, informed Jarrell that he would not hand over the money until he was in possession of the cocaine. At this point, Jarrell informed Detective Joyce that he was going to visit "his source" of the cocaine and ask whether the source would release the cocaine without payment in hand. Jarrell indicated that if his source was amenable to this request, the meeting would reconvene in a nearby Bob Evans restaurant parking lot.

Jarrell left the Waffle House parking lot and was followed by DEA Agent Scott Waugaman to an apartment complex located at 2526 Burgundy Lane in Columbus. Once Jarrell reached the entrance to the apartment complex, Agent Waugaman withdrew and maintained surveillance on the perimeter of the complex. Agent Waugaman radioed DEA Agent Leann Bakr and directed her to reestablish surveillance of Jarrell within the apartment complex.

By the time Agent Bakr entered the apartment complex, the gray Suburban that Jarrell was driving was parked in front of the garage door to one of the individual apartments. Agent Bakr testified that there were at least three apartments, each with a separate garage. The living area of each apartment is located directly above the garage; therefore, access to the front door required climbing a staircase. Since Agent Bakr did not see Jarrell exiting the Suburban nor did she see which apartment Jarrell entered, she parked her vehicle in a position to see both the gray Suburban and the front door of the apartment directly above the Suburban. After approximately fifteen minutes, Agent Bakr observed an individual exit the apartment under surveillance and enter the gray Suburban. Agent Bakr was unable to identify the individual at this time. Once the gray Suburban exited the apartment complex, a separate unit picked up surveillance of the gray Suburban while Agent Bakr maintained her position within the apartment complex.

At some point after Agent Waugaman parked his vehicle outside the apartment complex, he received radio notification that a different vehicle was leaving the complex. Agent Waugaman testified that he observed a green mid-sized sedan exit the apartment complex and that he initiated a tail of the vehicle. Agent Waugaman described the individual driving the green sedan as a white male with a bald head. According to Agent Waugaman, although it was dark outside, he was able to see the individual inside the green sedan because his "headlights were shining directly inside the vehicle." After Defendant was arrested at his home on June 27, 2007, Agent Waugaman was at the scene and later testified that Defendant was the driver of the green mid-sized sedan that he observed leaving the apartment complex on the evening of March 9, 2007.

Agent Waugaman followed the vehicle for only a short period until he was called back to the apartment complex at 2526 Burgundy Lane. Prior to abandoning the tail on the green sedan, Agent Waugaman

relayed the license plate number of the green sedan to other members of the surveillance team. While Agent Waugaman maintains that he relayed the license plate number accurately, the investigation later revealed that the license plate number relayed by Agent Waugaman did not belong to a green mid-sized sedan but rather to a white Honda Civic registered to an owner in Cleveland, Ohio. Agent Waugaman testified that in his experience as a DEA agent, it is not uncommon during drug surveillance to discover that license plate numbers do not correspond to the vehicles under surveillance.

While Agents Bakr and Waugaman remained at 2526 Burgundy Lane, a separate unit of the surveillance team followed the gray Suburban as it exited the apartment complex. DEA agents followed the gray Suburban from the apartment complex to a Bob Evans restaurant parking lot where the CI was waiting in a parked vehicle. Agent Heufelder and Sergeant Steve Overholser with the Columbus Police Department were also in the Bob Evans parking lot maintaining surveillance of the CI's vehicle. At approximately 8:00 p.m., the gray Suburban arrived at the Bob Evans parking lot; Jarrell was driving the vehicle. The CI exited his vehicle and got into the passenger seat of Jarrell's gray Suburban. Within minutes, the CI placed a phone call to Agent Heufelder signaling that Jarrell was in possession of the kilogram of cocaine; the arrest team moved in and Jarrell was arrested without incident.

Shortly after he was arrested, Jarrell signed a *Miranda* waiver and began talking to the authorities. While the authorities were questioning Jarrell, his cell phone began to receive multiple phone calls from an individual listed in the cell phone's internal memory as "Pepster." Jarrell's cell phone also received several calls from a different number with the label "Pep." In fact, Agent Heufelder testified that Jarrell's cell phone received at least fourteen phone calls that evening from the numbers associated with the names "Pep" and "Pepster." Defendant's birth name is Pepi Nechovski, and Jarrell testified that Defendant was listed in his cell phone under Defendant's nicknames "Pep" and "Pepster." Agent Heufelder and Officer Overholser testified that, based on their experience in law enforcement, they believed "Pepster" was the supplier of the cocaine because suppliers of drugs typically want their "money returned fairly quickly." In an attempt to identify "Pepster," Officer Overholser brought up a picture of Defendant on a computer screen located in one of the Columbus Police Department patrol cruisers. Officer Overholser testified that Jarrell identified the individual in the

picture as the individual calling him at that time.

At one point, Agent Heufelder allowed Jarrell to answer one of the calls from "Pepster." Officer Overholser instructed Jarrell to tell the caller that "everything was fine" and that "there were no problems" in regards to the drug transaction; Jarrell complied with the officer's instructions. The conversation between Jarrell and the unknown caller was not recorded. Agent Heufelder, however, was able to hear the person on the phone and testified that the person speaking to Jarrell had a European accent. After having the occasion to listen to Defendant's voice when he was arrested on June 27, 2007, Agent Heufelder testified at trial that the voice he heard on the phone on the evening of March 9, 2007 was Defendant's voice.

The DEA and the Columbus Police Department were able to trace the phone number associated with the incoming calls from "Pepster" to a cell phone owned by a Steven Elliott Scott, Jr. Scott Jr.'s father, Steven Elliot Scott, Sr., testified that he had known Defendant since the seventh grade. Because of his father's relationship with Defendant, Scott Jr. knew Defendant well and referred to him as "Uncle Pete." At trial, Scott Jr. testified that he met Jarrell several times at Defendant's house when Jarrell performed tattoo work. Scott Jr. explained that "I always used to go to my Uncle Pete's house and DJ on the DJ equipment." According to Scott Jr., this led Jarrell to give him the nickname "Little Pepster." He claimed that Jarrell must have saved Scott Jr.'s name in his cell phone under the label "Pepster."

In response to the Government's questioning regarding the multiple phone calls Jarrell received from Scott Jr.'s number on the evening of March 9, 2007, Scott Jr. explained that he made the multiple phone calls to Jarrell. Scott Jr. testified that all of the phone calls related to a tattoo:

> Q.: Now, can you explain to me and to the jury why your phone was in such constant contact with Shawn Jarrell while he was making a drug deal?
>
> Scott Jr.: Yes sir. I had called Shawn [Jarrell] for a tattoo, right, and he told me to call him back. So I kept trying to call him back because it was like my dad told me to call him at first for the tattoo. He told me to call him back, right. I kept calling and calling, but I didn't get no answer....

5

Q.: The question I'm going to ask you now, did you make 15 phone calls to Arthur Jarrell between 8:18 and 10:00 p.m. right after he was arrested with a kilo of cocaine?

Scott Jr.: Right, for a tattoo I kept calling him because, I mean, was trying to get this finished. That's what I really wanted.

Q.: Okay. That was the most important thing in your life that night, so you called 15 times to get it done?

Scott Jr.: Well, he told me to call him back, so I kept calling him back.

Scott Jr. denied having any knowledge of the drug deal and denied ever giving his phone to Defendant.

In addition to the phone calls made to Jarrell's cell phone on March 9, 2007, phone records revealed that someone from the number subscribed to Scott Jr. called Jarrell on March 7, 2007 shortly after the CI met with Jarrell. These same records also revealed that Jarrell called this number on March 8, 2007 shortly after Jarrell spoke with the CI. At one point, Scott Jr. testified that he made these phone calls to Jarrell in reference to the tattoo. Later at trial, Scott Jr. testified that he could not explain the phone calls made on March 7 and 8, 2007, possibly because he let his father use his phone during this period of time.

On the evening on March 9, 2007, approximately forty minutes after the Suburban exited the Burgundy Lane complex, Agent Bakr observed another individual leave the apartment under surveillance. Authorities later identified this man as Jimmy Hampton, the tenant and primary resident of that apartment. Upon leaving the apartment, Hampton was immediately detained and interviewed by the authorities. Hampton told authorities that he had been friends with Defendant for approximately six years. Specifically, Hampton testified that he met Defendant through their mutual interest in disc jockeying and that he talks with Defendant "probably 20 times a day." Hampton denied knowing an individual named Shawn Jarrell and in response to being shown a picture of Jarrell, Hampton stated "I've never seen that guy in my life." After being questioned about the events that occurred on the evening of March 9, 2007, Hampton told authorities that to his knowledge, neither Defendant nor Jarrell had been in his apartment that evening and that no drug transaction occurred at his apartment. In addition, Hampton consented to a search

of his apartment; no drugs or drug paraphernalia were found.

The kilogram of cocaine seized from Jarrell when he was arrested was submitted to the Columbus Police Department laboratory for testing. Detective Mark Green with the Columbus Police Department crime scene search unit discovered a single latent fingerprint from the adhesive side of a piece of masking tape on the cocaine packaging. A lift of the fingerprint was transferred to Officer Robert Lawson, a supervisor in the latent fingerprint section at the Columbus Police Department. After studying the known prints of Defendant, Officer Lawson testified at trial, in response to a question asking for "scientific certainty," that the fingerprint on the masking tape belonged to the Defendant. Officer Lawson also testified that if an individual touched the sticky side of a piece of tape and the piece of tape was then placed back on the roll, when the tape was pulled off again, this process could destroy part or all of a fingerprint. Officer Lawson admitted that this was based purely on his expert opinion and was not based on any research that he had performed.

Michael Sweedo, an expert in the field of fingerprint identification, testified as a defense witness at trial. Sweedo confirmed Officer Lawson's testimony that the latent print from the masking tape and the known prints of Defendant were made by the same individual. Sweedo, however, also described an experiment that he had conducted with various kinds of adhesive tape. Sweedo testified that he was able to obtain latent fingerprints up to a year after they had been deposited on the adhesive side of various kinds of tape. Sweedo admitted that his experiment was performed in a controlled environment and that it may not "totally reflect real life scenarios." Sweedo also admitted that he had not used masking tape in his experiment, which was the type of tape on which Defendant's latent print was found. On cross-examination, Sweedo was asked whether a fingerprint that was deposited on the adhesive side of a piece of tape would be distorted if that piece was "put back on to the roll...." Sweedo responded that in his expert opinion, it would not "distort it sufficiently to be able to not effect an identification. Either the print is identifiable or it's not identifiable."

At Defendant's trial, Jarrell was the second witness called by the Government. Jarrell stated that he had known Defendant for multiple years and that he considered Defendant a good friend. During his testimony, Jarrell stated that he had two numbers for Defendant saved

on his phone and that they were listed under the labels "Pep" and "Pepster." Jarrell denied ever buying drugs from or selling drugs to Defendant. When questioned on the source of cocaine that he sold in the two instant drug transactions, Jarrell testified that he obtained the cocaine "[f]rom a guy I'd met at a bar out on the east side." Immediately after making this statement, however, Jarrell testified "I'm sorry ... I've been lying to you the whole time. I was scared to death, and I didn't know what to do, and I can't sit here in a court of law and lie." At that point, direct examination of Jarrell ceased and the jury was excused. Jarrell was not recalled as a witness. After Jarrell was excused as a witness, the Government presented the following additional witnesses in order: Detective Green, Hampton, Agent Waugaman, Agent Bakr, Sergeant Overholser, Scott, Sr., Scott, Jr., Officer Lawson, and Agent Heufelder. The last witness to testify at trial was Michael Sweedo, Defendant's expert witness.

On August 7, 2008, the jury found Defendant guilty on Count One of the superseding indictment: conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846. On November 25, 2008, Defendant was sentenced to 120 months in prison, the mandatory minimum sentence.

*United States v. Nechovski*, 372 Fed.Appx. 568, unpublished, 2010 WL 1377876, at *1-6 (6th Cir. April 7, 2010). Petitioner filed a timely appeal, asserting that the evidence was constitutionally insufficient to sustain his conviction. On April 7, 2010, the United States Court of Appeals for the Sixth Circuit affirmed the judgment of the District Court. *Id.* On October 4, 2010, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari. Nechovski v. United States,* 131 S.Ct. 278 (2010).

On September 26, 2011, Petitioner filed the motion to vacate, set aside or correct sentence. He asserts that he is held in custody in violation of the Constitution of the United States on the following grounds: (1) he was denied the effective assistance of counsel, at the pre-trial stage, because his attorney failed to file a motion to dismiss the charges based on a violation of the Speedy

Trial Act and because his attorney failed to investigate properly; (2) he was denied the effective assistance of counsel, during trial, because his attorney failed to properly cross-examine Agent Heufelder and Agent Waugaman, failed to argue that the exclusion of evidence regarding a complaint filed against Agent Waugaman deprived him of his right to present a defense, failed to re-call prosecution witness Arthur Shawn Jarrell to testify that he had lied when he told police that it was Petitioner who had supplied the drugs, failed to request a dismissal of the charges based on the government's non-disclosure of Jarrell's testimony that he had lied, and failed to advise Petitioner of his right to testify, refusing to permit Petitioner to testify on his own behalf; and (3) he was denied the effective assistance of counsel, on appeal, because his appellate attorney failed to raise claims regarding the alleged denial of Petitioner's right to a speedy trial, denial of his right to present a defense, *Brady* and *Jencks* violations, denial of Petitioner's right to testify on his own behalf, and the ineffective assistance of trial counsel.

It is the position of the Respondent that Petitioner's claims are without merit.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.*

**PreTrial:**

In claim one, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to file a motion to dismiss the charges against him based on a violation of the Speedy Trial Act. In response to this claim, Respondent has attached the affidavit of Petitioner's trial counsel, Richard A. Cline, Esq., in which Cline avers, in relevant part, as follows:

> Mr. Nechovski is accurate when he states that I failed to move to dismiss the case under the speedy trial statute. I did not file the motion because I did not consider the motion supported by existing law or a good faith extension of existing law.

*Affidavit of Attorney Richard A. Cline*, attached as *Exhibit A* to *Return of Writ*.

Under the Speedy Trial Act, 18 U.S.C. § 3161, a criminal defendant must be brought to trial

within seventy days from the filing of the indictment or from the defendant's initial appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  A defendant who is not brought to trial within this period (as extended  under § 3161(h)),[1] may file a motion to dismiss the charges.

---

[1]  18 U.S.C. § 3161(h) provides in relevant part:

 The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to--

(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

(B) delay resulting from trial with respect to other charges against the defendant;

(C) delay resulting from any interlocutory appeal;

(D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

(E) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;

(F) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable;

(G) delay resulting from consideration by the court of a proposed plea agreement to be entered into by the defendant and the attorney for the Government; and

(H) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

(2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct.

(3)(A) Any period of delay resulting from the absence or unavailability of the defendant or an essential witness.

(B) For purposes of subparagraph (A) of this paragraph, a defendant or an essential witness shall be considered absent when his whereabouts are unknown and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence. For purposes of such subparagraph, a defendant or an essential witness shall be considered unavailable whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2).

The indictment was returned in this case on June 7, 2007. *Indictment,* Doc. No. 1.

Petitioner's initial appearance was held on June 28, 2007, *Minute Entry*, Doc. No. 5, and conditions

of release were established following a detention hearing on July 2, 2007, *Order Setting Conditions*

*of Release*, Doc. No. 10. A trial date of September 4, 2007 was originally established, *Scheduling*

*Order*, Doc. No. 15, but on August 16, 2007 Petitioner filed a motion for a continuance, *Amended*

*Motion for Continuance of Pre-Trial and Trial Date*, Doc. No. 19.    Petitioner characterizes this

---

or he resists appearing at or being returned for trial.

(4) Any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial.

(5) If the information or indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge.

(6) A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

(7)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

extension of the trial as "questionabl[y]" excludable under the Speedy Trial Act because the government failed to provide timely discovery. *Memorandum in Support of Motion to Vacate*, PageID #725. However, Petitioner's amended motion for a continuance was based on the representations that defense counsel needed more time to not only review discovery (which had yet to be received), but also to investigate the case and to engage in appropriate plea negotiations; the motion also asserted that any period of delay caused by the continuance would be excluded from the speedy trial clock. *See* Doc. No. 19.

Petitioner's motion was granted on August 20, 2007 and the trial was continued to October 16, 2007. *Order*, Doc. No. 20. On October 11, 2007, a superseding indictment was filed, *Superseding Indictment*, Doc. No. 24, and an arraignment on the *Superseding Indictment* was scheduled for October 24, 2007. *Notice*, Doc. No. 26. On the date of the scheduled arraignment, however, Petitioner's attorney sought and was granted leave to withdraw. *Minutes*, Doc. No. 27. New counsel was thereafter appointed. and Petitioner's arraignment on the *Superseding Indictment* was rescheduled to October 29, 2007. *Notice,* Doc. No. 30. That arraignment was twice thereafter continued – once because Petitioner had not received notice. *Minutes*, Doc. No. 32. On November 15, 2007, and after new counsel sought and was granted leave to withdraw, Petitioner – now represented by Mr. Cline – was arraigned.

The matter was scheduled for jury trial to begin on December 17, 2007. *Scheduling Order,* Doc. No. 36. On December 10, 2007, however, Petitioner filed a motion to continue the trial. *Motion of Defendant Nechovski to Vacate Trial Date*, Doc. No. 37. That motion was granted and the trial date was continued to February 19, 2008. *Amended Scheduling Order,* Doc. No. 39.

Petitioner contends that the speedy trial clock expired on December 10, 2007. *Memorandum*

*in Support of Motion to Vacate,* PAGEID #726.

Even assuming, *arguendo*, Petitioner's contention in this regard, Petitioner has failed to establish the ineffective assistance of counsel in failing to move to dismiss the *Superseding Indictment* on this basis, because all the factors set forth in 18 U.S.C. § 3162(a)(1) would have militated in favor of a dismissal without prejudice. *See Campbell v. United States*, 364 F.3d 727, 731 (6th Cir. 2004). Petitioner was charged with serious drug and firearm(s) offenses for which he was ultimately sentenced to an aggregate term of ten years imprisonment. The delays in bringing Petitioner to trial were not extensive and were based on Petitioner's own request for continuance, the filing of additional charges, and the withdrawal of initial and substitute defense counsel. Moreover, Petitioner does not allege, and the record does not reflect, that he suffered any actual prejudice as a result of the delay. There is no allegation or evidence that the government engaged in any improper behavior or an attempt to take tactical advantage of the delay. *See id.; see also Finley v. United States*, No. 3:03CR013, 2007 WL 2815440, at *4-5 (S.D. Ohio Sept. 25, 2007)(citing *United States v. Robinson*, 389 F.3d 582, 589 (6th Cir. 2004).

> This court's conclusion also finds strong support in cases involving ineffective assistance of counsel claims based on purported failures of counsel to object to violations of other provisions of the Speedy Trial Act, such as 18 U.S.C. § 3161(c). *See, e.g., United States v. Jackson*, 22 Fed. Appx. 396, 398 (6th Cir.2001) (rejecting a defendant's ineffective assistance of counsel claim where, although the failure to seek a dismissal deprived the defendant of his right to request a dismissal with prejudice, the defendant failed to show "a reasonable probability that the district court would have dismissed the indictment with prejudice"); *United States v. Theurer*, 1994 U.S.App. LEXIS 21412, 1994 WL 420072, *7 (7th Cir. Aug.11, 1994) (rejecting a claim that counsel's performance was ineffective where the defendant had not demonstrated that "her attorney's failure to file the motion to dismiss on Speedy Trial grounds had any adverse impact on the fairness of her trial"); *United States v. Matlock*, 2006

14

U.S. Dist. LEXIS 4889, 2006 WL 306902, *4 (E.D.Cal. Feb.8, 2006) (concluding that a § 2255 petitioner failed to establish ineffective assistance of counsel because "even if defendant had moved to dismiss, successfully, such dismissal would have been without prejudice to the government obtaining a new indictment, in light of the seriousness of the case, the lack of bad faith by the government concerning delay, and the public interest in the administration of justice to enforce drug laws"); *see also United States v. Carreon*, 626 F.2d 528, 533 (7th Cir.1980) (concluding that a dismissal of an indictment without prejudice was proper where the crimes were serious, the defendant claimed no prejudice as a result of the delay, the government did not intentionally seek the delay, and the circumstances of the case were not likely to recur).

*Finley v. United States*, 2007 WL 2815440, at *5. Thus, Petitioner cannot establish that he was prejudiced, as that term is defined under *Strickland*.

Petitioner also asserts that he was denied the effective assistance of counsel because his trial attorney refused to hire an investigator to re-enact "the conditions and circumstances surrounding the phone call he had allegedly made to Jarrell," in order to impeach Agent Heufelder's testimony that he was able to overhear a telephone conversation between Petitioner and Jarrell. *Memorandum in Support of Motion to Vacate,* PAGEID #728. Petitioner insists that, had his attorney re-enacted the precise conditions under which Agent Heufelder testified that he overheard Petitioner's voice, the evidence would have discredited Agent Heufelder's identification of Petitioner as the caller on Jarrell's telephone shortly after Jarrell's arrest. *Memorandum in Support of Motion to Vacate,* PageID #729.

Petitioner's trial attorney denies that Petitioner requested him to hire an investigator to experiment whether Special Agent Heufelder could have identified Petitioner's voice by overhearing the telephone conversation. In any event, however, Mr. Cline avers that such an experiment would have been pointless because "common experience demonstrates that a person can overhear

conversations as described by Agent Heufelder." *Affidavit of Richard A. Cline,* ¶ 2(b).  Instead, Petitioner's trial counsel addressed this point in his closing argument, highlighting all the evidence that was inconsistent with Special Agent Heufelder's testimony in this regard. *Trial Transcript, Vol. IV,* PAGEID #345-47 Doc. No. 102.

Plaintiff's claim in this regard is based on sheer speculation.  Plaintiff offers no evidence that experimentation would have produced scientific evidence sufficient to  discredit  Special Agent Heufelder's testimony that he was able to overhear Petitioner's voice during the telephone conversation with Jarrell.  Certainly, Petitioner does not explain why counsel's closing argument on this point was not equally effective.  In short, the Court concludes that Petitioner has failed to establish that his trial counsel's performance in this regard was deficient or that he suffered prejudice by reason of his counsel's failure to procure the experimentation proposed by Petitioner.

Petitioner also argues that his attorney performed in a constitutionally ineffective manner by failing to retain an expert witness to testify that Petitioner has no identifiable accent in order to cross examine and discredit the testimony of Special Agent Heufelder on this point.  Petitioner has submitted his own statement[2] denying that he has a European accent. *Affidavit of Pete Nechovski*, ¶ 1, attached as *Exhibit 1* to *Petitioner's Notice of Filing of Supplemental Exhibits*, Doc. No. 121. Jarrell also avers that Petitioner does not have a European accent. *Affidavit of Arthur Shawn Jarrell,* ¶ 21, attached as *Exhibit 2* to *Petitioner's Notice of Filing of Supplemental Exhibits.*  In support of this claim, and of his claim that his attorney failed to properly cross-examine Special Agent

---

[2]Petitioner's statement invokes 28 U.S.C. § 1746, which establishes the admissibility of certain unnotarized statements.  Petitioner's statement does not meet the standards of § 1746, however, because it is not dated.  *See Affidavit of Pete Nechovski*, p. 2.

Heufelder on this point, Petitioner has also submitted the *Sworn Declaration of Rosalind Gann*[3]

indicating in relevant part that, on June 14, 2012, she conducted a face-to-face interview with

Petitioner to determine whether he has a detectable Eastern European accent and whether Special

Agent Heufelder could have identified Petitioner as the person he overheard on the telephone on

March 9, 2007. Dr. Gann states that it is her professional opinion as a trained linguist that

Petitioner's accent "is largely indistinguishable from that of a native English speaker, and is that of

the American Midwest. It must be noted that a foreign accent cannot be shed at will like an article

of clothing." *Sworn Declaration of Rosalind Gann*, attached to *Reply*, Doc. No. 139. Dr. Gann

further states that she would testify that "it is virtually impossible that Mr. Nechovoski is the person

Agent Heufelder. . . overheard during a telephone conversation on March 9, 2007." *Id.*

In her report, *Linguistic Evaluation*, attached as *Exhibit 4* to *Sworn Declaration of Rosalind

Gann*, Dr. Gann reports that Petitioner was born in what is now Macedonia but that he emigrated

to the United States at the age of 2. *Id.* at PAGEID # 881. The family spoke Macedonian and

petitioner "failed one elementary school grade" because he found English difficult. *Id.* at PAGEID

#882. However, English is now Petitioner's "dominant language." *Id.* Dr. Gann noted "slight,

barely perceptible traces of the Macedonian sound system" in Petitioner's speech, but these traces

"largely disappear when transferred to recording equipment. . . ." *Id.* at PAGEID #884. Dr. Gann

opined that Petitioner's "[o]ccasional vestiges of the Macedonian sound system" "would not have

been detected on an overheard phone call." *Id.*

Petitioner's trial counsel observed that "Mr. Nechovski does have a distinctive accent that

---

[3]Dr. Gann has an Ed.D. in Literacy, with specializations in Literacy Education, Reading Linguistics and Teaching English as a Second Language. *Curriculum Vitae, Dr. Rosalind Raymond Gann*, attached as *Exhibit 1* to *Declaration of Rosalind Gann.*

is noticeably different from most residents of central Ohio. . . ." *Affidavit of Richard A. Cline*, ¶ 2(b). Petitioner's counsel would not have pursued efforts to establish that his client does not have a European accent. *Id.*

This Court concludes that Petitioner has failed to establish the ineffective assistance of counsel in this regard. His trial counsel noted a distinctive accent in Petitioner's speech and even Petitioner's expert agrees that Petitioner's speech reflects "vestiges of the Macedonian sound system." Under these circumstances, it cannot be said that counsel's failure to retain an expert in an effort to attempt to establish that Special Agent Heufelder could not have detected that accent in an overheard telephone conversation fell so far outside the wide range of reasonable professional assistance as to amount to constitutionally ineffective assistance.

**During Trial:**

Petitioner complains that his trial attorney failed to permit him to testify on his own behalf to refute Special Agent Heufelder's testimony, despite Petitioner's request. *Affidavit of Pete Nechovski*, ¶¶ 2-3. In response, Mr. Cline avers:

> A defendant in a federal criminal case has an absolute right to testify. I did not have the power to prevent Mr. Nechovski from testifying if he wanted to do so. However, I did counsel against Mr. Nechovski testifying. First, Mr. Nechovski had a prior drug trafficking conviction arising out of facts remarkably similar to those involved in this case. The jury did not hear about that prior drug trafficking conviction because Mr. Nechovski did not testify. Secondly, Mr. Nechovski does, in my opinion, have a distinctive accent. Had Mr. Nechovski testified it would have allowed the jury to conclude that Agent Heufelder was correct when he described Mr. Nechovski's accent as "Eastern European" and memorable.

> Having said that, I always inform the defendant that he has an absolute right to testify in his own defense, and I did so in this case. Mr. Nechovski is simply wrong when he alleges otherwise.

*Id.,* ¶ 3(f).

> "The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant"; nevertheless, "[b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *United States v. Webber*, 208 F.3d 545, 550–51 (6th Cir. 2000). Indeed, "when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed," and if a defendant disagrees with this decision, he "must alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand." *Id*. at 551 (internal quotation marks omitted). "When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." *Id.*

*Goff v. Bagley,* 601 F.3d 445, 471 (6th Cir. 2010). Petitioner does not allege, and the record does not reflect, that he alerted the Court of his desire to testify on his own behalf. This claim, therefore, is without merit.

Petitioner also complains that his attorney failed to cross-examine Special Agent Heufelder on the unlikelihood that he could have identified Petitioner by overhearing the cell phone conversation with Jarrell after Jarrell's arrest.[4] Petitioner specifically denies speaking to Jarrell on his cell phone on the day of Jarrell's arrest. *Affidavit of Pete Nechovski,* ¶ 7. Defense counsel responds as follows:

---

[4]Petitioner also complains that his trial attorney was constitutionally ineffective in failing to challenge Special Agent Heufelder's testimony that Petitioner had a European accent and in failing to call any defense witnesses to refute Heufelder's testimony on this point. For the reasons previously articulated, the Court concludes that Petitioner's trial counsel was not ineffective in this regard.

The facts at trial support Mr. Nechovski's claim that Agent Heufelder had never met Mr. Nechovski prior to the date of the phone call which Agent Heufelder alleges was between Mr. Nechovski and Mr. Jarrell. However. . . Agent Heufelder did meet Mr. Nechovski several months later. During that meeting Agent Heufelder interacted with Mr. Nechovski and heard Mr. Nechovski speak. Agent Heufelder testified at trial that it was during this later, person to person, interaction with Mr. Nechovski that Agent Heufelder recognized that Mr. Nechovski spoke with the same distinctive accent that Agent Heufelder claimed to have heard in the telephone call on the date Mr. Jarrell was arrested. As previously noted, Mr. Nechovski does have a distinctive accent that is different from that of most residents of central Ohio, and I did not call any witnesses to describe this accent.

*Affidavit of Richard A. Cline*, ¶ 3(a). As noted *supra*, Petitioner's trial counsel attacked this witness' credibility during closing argument. *Trial Transcript*, PAGEID # 345-47. Petitioner does not suggest what questions on cross-examination would have been more effective. Under these circumstances, the Court concludes that Petitioner has failed to establish his claim of ineffective assistance of counsel by reason of his counsel's failure to further cross-examine Special Agent Heufelder.

Petitioner also characterizes his attorney as constitutionally ineffective because he failed to recall Jarrell to testify as a defense witness after Jarrell testified on direct examination by the Government that he had "been lying to you the whole time." In support of this claim, Petitioner has attached the affidavit of Arthur Shawn Jarrell indicating, *inter alia*, that he identified Petitioner as his drug supplier when arrested by police only out of fear of retaliation by the members of a biker gang who had actually supplied him with the drugs at issue. In regard to the telephone call that night, Jarrell states, "One of the officers attempted to listen in on the phone call but given the size and low earpiece volume of the phone it is my opinion that he did not hear the substance of the

conversation." *Affidavit of Arthur Shawn Jarrell,* ¶ 20.  Jarrell states that he lied when he named

Petitioner as the caller on his cell phone shortly after his arrest and as his drug supplier. *Id., ¶¶* 23-33

As noted *supra,* Jarrell testified at trial that his source of cocaine was "a guy I'd met at a bar out on

the east side."  *United  States v. Nechovski*, 2010 WL 1377876, * 6.  He then stated that he had

"been lying to you the whole time."  *Id.*  In his affidavit, Jarrell states:

> At no time did Pete Nechovski and I discuss selling drugs.
>
> Pete Nechovski never supplied me with any drugs for sale.
> A few days before my arrest, I asked Pete Nechovski for a piece of adhesive tape, so that I could close a large slit in the top of the cocaine package located in my vehicle, unbeknownst to Pete.
>
> Pete Nechovski pulled a piece of that tape off of the roll of tape but then gave me the entire role of tape upon hearing that I would need substantially more tape.
>
> Pete Nechovski had no knowledge of the cocaine package located in my vehicle.
>
> On the night of my arrest, I feared that the two buyers (later identified as a confidential informant and an undercover agent) were going to rob me when I met them at the Waffle House to make the deal; I left without completing the deal but a few minutes later I set up a second meet with the buyers at another restaurant – Bob Evans.
>
> ***
>
> At that meeting, I attempted to sell approximately a kilogram of cocaine to the confidential informant, for which I was immediately arrested.
>
> During my arrest, an unknown number of police officers pointed their guns at me and one of the officers said "lie down or die".
>
> ***
>
> When the officers pointed their guns at me, I was in great fear.  When officers questioned me concerning my supplier, I initially told them that I did not know.  When I could not give the officers the answer they wanted, I began to worry that I would be unable to go home.
>
> I feared I would suffer a swift death or substantial bodily harm if I revealed that members of a biker gang supplied me with the drugs in question.  I had met these drug suppliers through my job as a tattoo artist.  I knew by their reputation that these bikers would retaliate if

they found out that I had informed on them.

The package of cocaine these bikers supplied to me had a large slit in the top of it made by a knife. The bikers informed me that it was a good idea to cut a slit in the top of the package to ensure that the package contains cocaine, and that the cocaine is in the proper amount.

The bikers informed me that often times suppliers will use plaster of Paris to make it look like there is more cocaine in the package than there really was; They also informed me that suppliers sometimes use encyclopedia books and plaster of Paris to make it look like a valid kilo package of cocaine, when there is no cocaine at all.

The bikers had made the slit in the cocaine package, and that was the reason why I asked Pete Nechovski for the adhesive tape days earlier. Again, Pete did not know of the cocaine's existence.

While I sat in the police car with officers, "Pepster" called me. "Pepster" is known to me as Steve Scott Jr. I referred to Scott Jr. as Pepster, because he reminded me of Pete Nechovski. I sometimes referred to Pete as "Pep".

Hearing my nervous tone, Steve Scott Jr. asked me if everything was okay; I said yes; I did not tell him about the bust. Steve Scott Jr. was calling me as a friend, not in connection with the drug sale.

\*\*\*

I told the officers that Pete Nechovski was the caller and that he was my supplier.

Given that "Pepster" reminded me of Pete Nechovski and given that I had talked to Pete earlier, I believe this is the reason why I chose to finger Pete as my supplier. It was a split-second decision.

\*\*\*

There was no specific reason for me to implicate Pete Nechovski as my supplier other than the fact that "Pepster" called me at the wrong time.

After "Pepster" called my phone, my roommate called; I did not answer.

I am certain that had my roommate (or any other suitable candidates) called me first, I would have implicated them and not Pete Nechovski.

Before the trial, I instructed my cousin to give to Pete Nechovski's attorney a picture I took of the tattoo I did for Pete in the weeks prior; my cousin was able to deliver that picture to Pete Nechovski's attorney.

Before trial, I spoke to Pete Nechovski's lawyer for an hour or two and informed him that I "threw him under the bus." I told him that I would not be taking the stand to implicate Pete, because he was innocent.

During my testimony, I said that I had been "lying the whole time." It was my plan to testify that Pete Nechovski was not my supplier. I had been lying to the government when I previously implicated Pete Nechovski as my drug supplier. . . .

[A]fter my testimony was interrupted, one of the prosecutors angrily asked me why I said what I said. I informed him again that Pete was not my dealer. I informed him that I was supplied the cocaine by bikers.

***

Pete Nechovski is an innocent man.

*Affidavit of Arthur Shawn Jarrell.*

Defense counsel responds as follows:

I met with Mr. Jarrell in the jail prior to trial. In the course of that meeting Mr. Jarrell told me several different versions of how he came into possession of the kilogram of cocaine that was the subject of the conspiracy count in this case. Most of those versions inculpated Mr. Nechovski in the conspiracy. Towards the end of our discussion Mr. Jarrell indicated that he obtained this cocaine from "some guy in a bar" not Mr. Nechovski. I indicated to Mr. Jarrell that, if this statement was truthful, it would assist Mr. Nechovski at trial.

When Mr. Jarrell was called as a witness in the government's case in chief he testified to several things that helped the defense: (1) that he had been lying to the government about the source of his cocaine; (2) that Mr. Nechovski was not the source; and (3) the source was "some guy in a bar." The jury heard Mr. Jarrell make those statements. The United States sought to have Mr. Jarrell declared a hostile witness so that they could impeach him with all of his prior statements – all of which stated that Mr. Nechovski was the source for this kilogram of cocaine. I successfully prevented the government from cross-examining Mr. Jarrell in their case in chief.

I did not recall Mr. Jarrell in the defense case because to do [so] would have permitted the government to cross-examine him about all of his prior statements in which he stated that Mr. Nechovski was the source of his cocaine.

I was not aware of the government withholding information that Mr. Jarrell had recanted his testimony prior to my conversation with him. I did not file a motion to dismiss alleging prosecutorial misconduct

because I had no basis to file such a motion.

*Affidavit of Richard A. Cline*, ¶¶ 3(d), 3(f).

At the time of Petitioner's trial, Jarrell had pled guilty to conspiracy to distribute cocaine and was incarcerated. *Trial Transcript, Vol. II*, PAGEID #290, Doc. No. 99. Jarrell had agreed, pursuant to the terms of his negotiated plea agreement, to cooperate with the government and to testify truthfully regarding all matters involved in his prior distribution of narcotics. *Id.* Jarrell had been sentenced to a term of 38 months incarceration, a sentence that fell below the sentence recommended by the United States Sentencing Guidelines, pursuant to the government's motion for a downward departure. *Id.* at PAGEID # 291-92. Jarrell testified that he hoped for a further reduction in his sentence for his continued cooperation. *Id.* at PAGEID # 292. Jarrell had known Petitioner "a long time." Petitioner was "a good friend." *Id.* at PAGEID # 293. Petitioner's telephone numbers were entered into Jarrell's contacts list as "Pep" and "Pepster." *Id.* at PAGEID # 296. Jarrell had never purchased drugs from Petitioner prior to the "kilo deal." *Id.* Jarrell sold two ounces to a person named Jamie at the Waffle House for $15,000. He got these drugs "from a guy I'd met at a bar out on the east side." *Id.* at PAGEID #297. When asked by the prosecutor whom he contacted to obtain a kilogram of cocaine to sell to the confidential informant, Jarrell responded:

> I checked around and really didn't have no one that was willing to or being able to do anything like that. I didn't know many people to contact as it was. And I ended up getting ahold of the same guy I got it from the first time.

*Id.* at PAGEID # 299. Jarrell then stated:

> I'm sorry, Mr. Bosley. I've been lying to you the whole time. I was scared to death, and I didn't know what to do, and I can't sit here in

a court of law and lie.

*Id.* At that point, the prosecutor asked that Jarrell be declared a hostile witness and the jury was dismissed from the courtroom. *Id.*

Petitioner argues that Jarrell's testimony was confusing and that his trial counsel should have called Jarrell as a defense witness in order to clarify that Jarrell had lied when he identified Petitioner as his drug supplier. The record, however, reflects that defense counsel made clear in closing argument that Jarrell denied that Petitioner was his drug supplier and that he had previously lied to law enforcement personnel. *Trial Transcript, Vol. IV*, PAGEID # 567. Defense counsel also argued that Jarrell had good reason to lie to police because, although he had faced a five year mandatory minimum term of incarceration, he had been sentenced to only 38 months in prison. *Id.* at PAGEID #567-69. In short, defense counsel argued that Jarrell's in-court testimony was credible, but not his prior statements implicating Petitioner in the drug deal. *Id.* at PAGEID # 569-70.

> What is Mr. Jarrell's motive in this case? What is in his best interest as it relates to this testimony? If his testimony is driven by his own self interest, it would be better for Mr. Jarrell to stick with the story that he told the government agents on March 9th, 2007, a story that had already saved him 22 months in prison and had the potential to save him even more time.

*Trial Transcript, Vol. IV*, PAGEID #569.

The strategic decisions of counsel, "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690.

> "[T]rial counsel's tactical decisions are particularly difficult to attack." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). . . . The strategy "need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney. . . would assess as

> reasonable to achieve a 'specific goal.' " *Cone v. Bell*, 243 F.3d 961,
> 978 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 685, 122 S.Ct.
> 1843, 152 L.Ed.2d 914 (2002).

*Hand v. Houk*, No. 2:07-CV-846, 2011 WL 2446383, at *63 (S.D. Ohio April 25, 2011).  Such are the circumstances here.

Petitioner also alleges that his attorney should have filed a motion to dismiss the charges based on the prosecutor's failure to disclose Jarrell's recantation prior to trial.  However, nothing in the record supports Petitioner's allegation that the prosecutor knew before trial that Jarrell had recanted or intended to recant his implication of Petitioner in the drug conspiracy and that the prosecution  improperly failed to disclose that fact to the defense.  To the contrary, the record reflects the prosecution's surprise at Jarrell's testimony. *Trial Transcript, Vol. II*, PAGEID #302-03.  The Assistant United States Attorney had met with Jarrell the week before and had  "no indication any of this was going to happen."  *Id*. at PAGEID #303.  He had met again with Jarrell shortly before Jarrell was called to testify and, again, Jarrell had given the prosecutor no indication that he would recant his prior identification of Petitioner as his drug supplier.  *Id.*

In short, the Court concludes that Petitioner has failed to establish that he was denied the effective assistance of counsel in connection with Jarrell's testimony at trial.

Petitioner also complains about his counsel's treatment of the testimony of Special Agent Waugaman that he saw Petitioner driving a green sedan associated with the drug transaction.  Noting that the license plate identified by Waugaman was actually registered to a different vehicle, Petitioner suggests that his attorney should have subpoenaed the owner of the license plate to verify that the plate had been stolen, as Waugaman had purportedly suggested.  *Memorandum in Support of Motion to Vacate,* PAGEID # 735. Petitioner also contends that his attorney should have objected

to Waugaman's testimony in this regard as speculative, without foundation and unduly prejudicial. *Id*. Petitioner further argues that his attorney failed to argue effectively that Waugaman had erroneously identified the color of the sedan as green – when the license plate indicated that it belonged to a white vehicle – and that Waugaman's identification of Petitioner as the driver of that car lacked credibility.

>      Petitioner's trial counsel responds to these allegations as follows:

>           I cross-examined Agent Waugaman about those items that I believed
>           would prove fruitful in cross-examination to either demonstrate bias
>           or inaccuracy in the observations he reported.

*Affidavit of Richard A. Cline,* ¶ 3(b).

>      Special Agent Waugaman testified that he maintained surveillance at the apartment complex on Burgandy Lane where Jarrell was seen entering. *Trial Transcript, Vol. III*, PAGEID #364, Doc. No. 101. Waugaman observed a green sedan exiting the apartment complex. Waugaman was located directly behind this vehicle and reported its license plate number. *Id.* at PAGEID #365. He could see "the back of the head and the side profile" of the car's driver "whenever the individual turned his head." *Id.* Waugaman described the driver as a white bald man. *Id.* "It was dark, but my headlights were shining directly inside the vehicle, and my vehicle was directly behind the green sedan." *Id*. at PAGEID #366. Approximately three months later, in June 2007, while conducting a search of Petitioner's residence, Waugaman recognized Petitioner as the driver of the green sedan immediately upon entering Petitioner's house. *Id.* at PAGEID # 367. Waugaman had no doubt regarding his identification of Petitioner. *Id*. at PAGEID # 368-69. He "pulled the case agent aside and advised" that it was the same person he had followed out of the apartment complex in March 2007. *Id*. at PAGEID # 367.

Petitioner has failed to establish the ineffective assistance of counsel under the two-prong *Strickland* test based on defense counsel's cross-examination of Special Agent Waugaman. First, Special Agent Waugaman did not testify that the license plate observed by him on the green sedan driven by Petitioner was stolen. Rather, he testified that it was not unusual, in his experience as a drug trafficking investigator, for a license plate to be registered to a vehicle different from the vehicle to which it is attached. *Id.* at PAGEID # 374. Furthermore, Petitioner's trial counsel effectively exploited other inconsistencies in the record. For example, Special Agent Heufelder testified on cross examination that, despite the importance of accuracy in investigative reports, no mention was made in any of the reports in this case that Waugaman had recognized, during the search of Petitioner's home, Petitioner as the driver of the green sedan. *Trial Transcript, Vol. III*, PAGEID #476-81. In his closing argument, Petitioner's trial counsel suggested to the jury that this inconsistency constituted good cause for discrediting Special Agent Waugaman's identification of Petitioner at trial. *Id.* at PAGEID # 576. Considering that it was unlikely that Special Agent Waugaman would concede any lack of credibility on his part, the strategic decision on the part of Petitioner's trial counsel in this regard – *i.e.*, to attack the agent's credibility during closing argument rather than on cross-examination – was not unreasonable.

Petitioner complains that his attorney failed to properly pursue evidence that Special Agent Waugaman had provided false testimony and evidence. *Memorandum in Support of Motion to Vacate,* PAGEID #738. The record provides no factual support whatsoever for Petitioner's allegation,[5] and Petitioner does not address this issue in his *Reply*. Petitioner has failed to establish

---

[5]The record reflects certain proceedings, the transcript of which has been sealed, *see Sealed Transcript*, Doc. No. 98; *Sealed Excerpt Transcript*, Doc. No. 100, involving a different witness.

the ineffective assistance of counsel on this basis.

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner claims that he was denied the effective assistance of counsel on appeal because his attorney failed to raise on appeal the claims asserted in his *Motion to Vacate*. *Memorandum in Support of Motion to Vacate*, PAGEID #753-54. The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes,* 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The United States Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

A. Were the omitted issues "significant and obvious?"
B. Was there arguably contrary authority on the omitted issues?
C. Were the omitted issues clearly stronger than those presented?
D. Were the omitted issues objected to at trial?
E. Were the trial court's rulings subject to deference on appeal.
F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
G. What was appellate counsel's level of experience and expertise?
H. Did the petitioner and appellate counsel meet and go over possible issues?
I. Is there evidence that counsel reviewed all the facts?
J. Were the omitted issues dealt with in other assignments of error?
K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir.1999). This list is not exhaustive and need not produce a certain "score." *Id.* at 428.

Because this Court has concluded that none of the underlying claims Petitioner raises are meritorious, the Court also concludes that Petitioner has failed to establish the ineffective assistance of appellate counsel. Additionally, it is significant to note that claims of ineffective assistance of trial counsel are properly raised in § 2255 proceedings, and not on direct appeal.

It is therefore **RECOMMENDED** that Petitioner's claims be **DISMISSED**.

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

__s/ Norah McCann King__

Norah McCann King

United States Magistrate Judge

November 27, 2012